## PEOPLE v. WOODS.

1. CRIMINAL LAW—CHARACTER WITNESS—NEGATIVE TESTIMONY—ADMISSIBILITY.

   The testimony of a character witness, in a criminal prosecution, that the reputation of defendant was good was admissible, although he admitted, on cross-examination, that he had never heard anything said about defendant's reputation, one way or another.

2. SAME—GOOD CHARACTER—PRESUMPTION—INSTRUCTIONS.

   It was error for the court below to refuse defendant's requested instruction that in a criminal prosecution the accused is presumed to be of good character.[1]

3. SAME.

   Where defendant's character evidence was negative, it was error for the court below to belittle it by stating to the jury that it was not "much evidence of character or reputation." [2]

4. SAME—GENERAL RULE—CONSPIRACY—EVIDENCE—ADMISSIBILITY.

   It is the general rule that, where several persons are engaged in one common unlawful enterprise, whatever is

[1]On presumption as to good character of accused in criminal case, see note in 46 L. R. A. (N. S.) 342.

[2]As to proof of character by negative evidence, see note in 22 L. R. A. (N. S.) 666; 2 L. R. A. (N. S.) 553.

said or done by any one of them in the prosecution of the common enterprise, or while it is still in progress, is evidence against all the parties to it.

5. SAME—ARSON—CONSPIRACY—EVIDENCE.
In a prosecution for arson, a conspiracy to burn the building in question having been *prima facie* proven, a conversation between witness and one of the conspirators in connection with work being done to further the conspiracy, was admissible.

6. SAME— EVIDENCE—TESTIMONY OF CO-CONSPIRATOR—ADMISSIBILITY.
In such prosecution, testimony of one of the conspirators implicating his co-conspirators, was admissible.

Exceptions before judgment from Bay; Houghton, J. Submitted April 17, 1919. (Docket No. 111.) Decided May 29, 1919.

Frank Woods was convicted of arson under section 15289, 3 Comp. Laws 1915. Reversed.

*Coumans & Gaffney,* for appellant.

*William A. Collins,* Prosecuting Attorney, for the people.

STEERE, J. On the night of February 2, 1915, a barn located on south Henry street in Bay City in which defendant ran a livery business was, with its contents, destroyed by fire. The fire was charged to have been of incendiary origin. Defendant was subsequently arrested, tried and convicted of having feloniously caused and procured the same to be burned for the purpose and with intent to injure and defraud the insurers of the contents of said barn in violation of section 15289, 3 Comp. Laws 1915. His conviction was thereupon appealed to this court for review on a bill of exceptions settled before sentence, containing some 40 assignments of error.

Defendant had been a resident of Bay City for many years. He had followed peddling fruits and vegetables

in Bay City and at times dealt in horses. In the spring of 1914 he entered into negotiations with one Henry LaFrance, an undertaker, by which he rented from him the barn which was burned, for an indefinite period at $10 a month, he to fix it up to suit himself. During the summer he bought of LaFrance a quantity of old livery stock for which he testified that he paid $3,150 and started a livery business. At the time of the fire his stock was covered by an aggregate insurance of $4,600 placed in seven different companies. They refused to recognize liability and protracted litigation followed which resulted eventually in his recovering a total of $4,393.91 insurance.

It was claimed by the prosecution that much of the property covered by this insurance was old, out of date and of small value, and that Woods' livery business proved unprofitable; that he and LaFrance, who occupied a building close to the livery barn and was on intimate terms with Woods, planned to burn this barn to get the insurance, and induced a hack driver named McCauley, who worked in Woods' stable then but had previously been employed by LaFrance, to assist in carrying out the project; that for this unlawful purpose the three entered into a conspiracy by which LaFrance and McCauley undertook, for a consideration from Woods and with his co-operation, to burn the barn by a contrivance combining a candle, bottle, gasoline and some ether which would ignite the hay in the loft at an agreed favorable time of the night when Woods was at home, which was accomplished as planned; that differences arose between McCauley and Woods in connection with or following the latter's litigation with the insurance companies, resulting in disclosures by McCauley which led to his own arrest in the spring of 1917, upon a charge of burning this stock. To this he pleaded guilty and turned State's evidence, disclosing the nature and circumstances of

the conspiracy pursuant to which the fire was set and the insured property burned, as claimed by the prosecution. Certain details of his confession incriminating Woods are also claimed by the prosecution to be verified by otherwise proven facts and circumstances, the particulars of which need not be gone into as they were matters for the jury in any aspect of the case. The defense was denial of any participation or previous knowledge, alibi, good character and that the fire was purely accidental and its cause unknown.

Defendant's many assignments of error group in substance to the proposition that there was prejudicial error in admitting the testimony of a witness named Sullivan as to a conversation with McCauley and in the reception of certain portions of McCauley's testimony; in permitting certain assertions in the prosecutor's closing argument; in refusing certain of defendant's requests to charge; in the charge as given; in striking out the testimony of a character witness of defendant's named Cook and the remarks of the court upon that subject.

Defendant had lived in Bay City on the west side for over 30 years and called as character witnesses several business men of the city who had known him for different periods ranging from 10 or 12 to 25 years. One of them was Charles Cook, cashier of the People's Commercial Savings Bank of Bay City, who stated he had known defendant 25 years, on the west side of the river, and had himself lived on the west side for 45 years. He was then asked and answered the following questions:

"*Q.* Have you, during that time and up to the present time, been familiar with Mr. Woods, to the extent of knowing whether or not he has a good reputation over there?
"*A.* I have. * * *
"*Q.* State whether or not you know his reputation.
"*A.* I do.

"*Q.* State to the jury what that reputation has been during the time you have known him.

"*Mr. H.* Good or bad?

"*A.* It has been good."

On cross-examination he admitted he had never heard anything said about his reputation one way or another. On motion of the prosecution the court then struck out all of Cook's testimony. As to this witness the facts and course pursued are closely analogous to those touching the same question in *Sinclair* v. *State,* 87 Miss. 330 (39 South. 522, 2 L. R. A. [N. S.] 533, 112 Am. St. Rep. 446), a manslaughter case in which a character witness called for defendant testified in direct examination that he knew the accused's general reputation in that community "for peace or violence," and that it was good. Having answered on cross-examination that he had "never heard it discussed at all," the court, on the State's motion, excluded the testimony. The supreme court of that State in reviewing the case said: "This was fatal error," followed by a discussion of the reasons, citing several decisions of that court and 1 Wigmore on Evidence, § 55 *et seq.* There, as here, character testimony of other witnesses was before the jury. In the instant case, without reinstating the testimony of Cook, the court ruled differently as to character witnesses later called. One of these, named Howard, a clothing merchant who had known defendant 15 years, testified on direct examination that he was familiar with his reputation "around the west side" where the witness knew him, and that it was good. On cross-examination he was put through the usual course of inquiry as to his source of knowledge against which he sought to fortify by asserting he "never heard any one say his reputation was bad," but on being asked by the court if he ever heard "anybody say anything, one way or the other," he answered, "No, sir, I never did." The court offered the reflection, "I don't think it is much proof of repu-

tation," but ruled, "we will let it stand." The testimony of other character witnesses of defendant which was allowed to stand, while assuredly adequate as affirmative testimony on direct examination, yielded on cross-examination to similar modifying answers. Of course neither party is in a position or has occasion to complain of this testimony, which was admitted; but if it was admissible, that of Cook certainly was. He was an old and apparently prominent citizen who testified to a familiar acquaintance with defendant in the locality where he resided for "about 25 years," a longer time than any of the other witnesses. Admitting this falls short of affirmative evidence and conceding all that is said as to its force by the prosecution or trial judge, who stated to the jury in his charge that "it isn't much evidence of character or reputation," it nevertheless falls within that class recognized in certain jurisdictions and by various text writers as "Negative evidence of character," and as such admissible. In 1 Wharton on Criminal Evidence (10th Ed.), p. 240, the author states with many modifying citations:

"The great weight of authority now is, that character can be established by negative testimony, so that one who has never heard the reputation of the defendant assailed, but who has been in a position where he probably would have heard it if it had been a subject of comment, may testify to the good character of such person, upon the very wise and logical theory that, if a person's reputation is never a subject of discussion in the community, it is more likely to be good than where it is the subject of discussion and comment. So that the best evidence of good reputation is where the witness testifies that he has never heard it discussed, questioned, nor talked about. The more unsullied and exalted the character is, the less likely it is ever to be called in question."

"It is a well-established rule that the testimony of a witness to the effect that he has never heard anything against the character or reputation of a certain

person, or that he has never heard the matter discussed, is admissible to prove the good character of such person, provided the witness has been in such a position that it is likely he would have heard anything that was said concerning the person's character or reputation. Indeed, negative evidence is the most cogent evidence of a man's good character and reputation, because a man's character is not talked about till there is some fault to be found with it. It is the best evidence of his character that he is not talked about at all." 10 R. C. L. p. 954.

"Affirmative testimony of express oral comments of the neighbors, friends and acquaintances of the accused, upon the reputation of the accused is not always required. Evidence that the character of the accused had never been denied or doubted, or even discussed or spoken of among his acquaintances, though negative in form, is always admissible and often of the highest value." Underhill on Criminal Evidence (2d Ed.), p. 147.

"Testimony of a witness that he has been acquainted with the accused for some time and under such circumstances that he would be likely to hear what was said about him and that he has never heard any one speak against his character is admissible." 12 Cyc. p. 416.

The foregoing quotations are well fortified by the numerous citations accompanying them. That the authorities are not entirely in harmony is apparent. Jurisdictions may be found which yet adhere to the more technical and narrow rule that good character of the accused in a criminal case can only be shown by affirmative proof of general reputation, but it is now universally recognized that proof of good character in some form is admissible and a valuable right of the accused, which may be of vital importance to him, and which he is entitled as a matter of right to lay before the jury as a part of his defense. His right to make such proof when under a charge of arson extends to proof of his general reputation. *State*

206—Mich.—2.

v. *Emery,* 59 Vt. 84 (7 Atl. 129). While no criminal case appears to have arisen in this State where the question of negative evidence of character was directly involved, its propriety and admissibility where the purpose is to sustain character was discussed and recognized as logically right in the civil case of *Lenox* v. *Fuller,* 39 Mich. 268. The issue directly involved there was the reputation of the party under inquiry for truth and veracity, but the reasoning and rule as stated are of general application. It was there said:

"Where, however, the witness is not called to *impair* but to *support* credit, the ground is different. Not to have been talked about at all in regard to integrity is not to have been talked against, and it is not objectionable to show that the veracity of the witness has not been questioned.

"The fact that a person's truthfulness has never been the subject of controversy is according to general observation and experience, very cogent evidence to prove him worthy of credit, and where those who would be likely to know if it had been the subject of criticism testify they have no knowledge that it has been, the evidence is proper as conducive to the effect that such person could not have borne the bad reputation imputed. *People* v. *Davis,* 21 Wend. (N. Y.) 309; *Gandolfo* v. *The State,* 11 Ohio St. 114; *State* v. *Lee,* 22 Minn. 407 (21 Am. Rep. 769)."

This case is cited in *Re Thayer's Estate,* 188 Mich. 261, and the rule applied in a character inquiry as to chastity. The testimony of witness Cook was clearly admissible. The accused in a criminal case is presumed to be of good character and defendant requested the court to so instruct the jury. This was not done, but the jury was told that the testimony defendant had been allowed to introduce on that subject was not "much evidence of character or reputation." The right to introduce any competent evidence of his good character and have it impartially submitted to the jury is a substantial right of perhaps vital importance to the accused—how important was for

the jury to determine—as this court early recognized and plainly stated in *People* v. *Garbutt,* 17 Mich. 26 (97 Am. Dec. 162). This combination of adverse rulings upon that subject and invasion of the province of the jury by belitting the character of testimony submitted to it deprived defendant of a substantial right pertaining to a fair and impartial trial, and was upon the face of this record as a conclusion of law presumptively prejudicial error indicating a miscarriage of justice in that particular which entitles defendant to a new trial.

We find no reversible error in rulings on the testimony of McCauley and Sullivan. Before the testimony complained of was offered a conspiracy had been *prima facie* proven. McCauley was one of the conspirators. His testimony implicating his co-conspirators was competent. The rule in such cases was early stated by this court as follows:

"The general rule is well settled that, where several persons are engaged in one common unlawful enterprise, whatever is said or done by any one of them in the prosecution of the common enterprise, or while it is still in progress, is evidence against all the parties to it." *People* v. *Pitcher,* 15 Mich. 396.

At the time of McCauley's conversation with Sullivan the conspiracy was in progress. It took place in connection with work being done to further the conspiracy, while some of the old livery stock was being moved from LaFrance's place into the barn proposed to be burned, which had attracted Sullivan's attention. We discover scant merit in most of the remaining assignments of error, and it is not to be anticipated that any which seem questionable will confront the court on a retrial.

The verdict must be set aside for the reasons stated and a new trial awarded.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.